**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| In re: Fitzpatrick Container Company, | Chapter 7 |
| Debtor. | Bky. No. 20-14139 (PMM) |
| Lynn E. Feldman, Chapter 7 Trustee, | |
| Plaintiff. | |
| v. | |
| Thomas Shallow, Jr., | |
| Defendant. | Adv. No. 24-0017 (PMM) |

# OPINION

### I. INTRODUCTION

The Chapter 7 debtor here is the now defunct Fitzpatrick Container Company ("Debtor," "FCC," or "Company"). The defendant, Thomas Shallow, Jr. ("Defendant" or "Shallow"), was FCC's president. The Trustee's Motion for Summary Judgment seeks to avoid and recover transfers made by the Debtor on the Defendant's behalf. The Motion is unopposed. Upon review of the facts and relevant law, the Court will grant relief as to Counts I, II, IV, V, and VI. Relief is denied as to Counts III, VII, VIII, and IX. The Trustee is entitled to judgment interest. She is not yet entitled to the shifting of her attorneys' fees or litigation costs.

### II. BACKGROUND

FCC made paper products and corrugated packaging. But by mid-2018, the Company was insolvent. Its situation worsened in 2019 and 2020. So much so that on October 19, 2020,

1

four (4) of FCC's creditors filed an involuntary Chapter 7 petition against the Company. Shallow was the source of numerous delays in the main case. Seven (7) orders were entered on that docket granting the Trustee's motions for additional time to gather information from the serially unresponsive Shallow. Little changed during the instant litigation.

The Complaint states nine (9) causes of action. The first five (5) advance avoidance claims. Counts I–III invoke related state law causes of action pursuant to the Trustee's strong-arm powers under 11 U.S.C. §544. Counts IV and V rely on analogous standalone causes of action under 11 U.S.C. §548. Count VI is grounded in 11 U.S.C. §550, which provides for the recovery of transfers avoided under 11 U.S.C. §§544 or 548. Count VII represents an alternative means of recovery predicated on the theory of Shallow's unjust enrichment. Counts VIII and IX were also pleaded in the alternative. With these latter two (2) counts, the Trustee seeks compensatory and exemplary damages for Shallow's breach of fiduciary duty and negligence. The Trustee further seeks pre- and post-judgment interest and to shift fees and costs.

The scope of the Trustee's claims has narrowed considerably at this stage. She defines the "Transfers" now in issue as those that occurred after July 1, 2018, when FCC was already insolvent. See In re Fitzpatrick Container Co., 670 B.R. 425, 434 (Bankr. E.D. Pa. 2025) (holding that "FCC was presumptively insolvent beginning in mid-2018."). These Transfers encompass four (4) tranches of payment made by FCC to: (1) Shallow himself, in the form of Company checks; (2) the American Express Company ("AMEX"), for charges to FCC's credit card incurred on Shallow's behalf; (3) Capital Blue Cross, Shallow's health insurance provider; and (4) Saucon Valley Country Club, where Shallow held a membership. A subset of these payments has been clawed back by the Trustee. The aggregate numerical value of the Transfers, as broken down below, is $541,685.20:

2

| AMEX Charges | FCC Checks to Shallow | Blue Cross Expenses | Country Club Dues | The "Transfers" |
|---|---|---|---|---|
| $355,705.58 | $129,129.92 | $38,883.07 | $17,966.63 | $541,685.20 |

Central to the Trustee's claims is her assertion that Shallow treated FCC like "his own personal 'piggy bank.'" She points, for example, to the affidavit of Christopher Phillips, CPA. In his professional opinion, FCC received no value for the Transfers.

Critically, Shallow chose not to respond to the Motion.

### III. SUMMARY JUDGMENT STANDARD

The summary judgment standard is well known. Pursuant to Federal Rule of Civil Procedure 56(a), summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Genuine issues of material fact refer to "any reasonable disagreement over an outcome-determinative fact." In re Energy Future Holdings Corp., 990 F.3d 728, 737 (3d Cir. 2021) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The purpose of a motion for summary judgment is not to weigh the evidence presented, but rather to determine if the evidence warrants adjudication by trial. Anderson, 477 U.S. at 249–252. When reviewing the evidence presented, the court must draw all reasonable inferences in the light most favorable to the non-moving party. Halsey v. Pfeiffer, 750 F.3d 273, 287 (3rd Cir. 2014). However, to successfully oppose entry of summary judgment, the non-moving party may not simply rest on its pleadings, but must demonstrate, through the submission of admissible evidence, that a factual dispute remains for trial. In re Bentivegna, 597 B.R. 261, 263–64 (Bankr. E.D. Pa. 2019) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)).

## IV. ANALYSIS

Respectively, Counts I and II are grounded in theories of actual and constructive fraud pursuant to §5104(a)(1) and (2) of the Pennsylvania Uniform Voidable Transactions Act ("PUVTA"), by way of 11 U.S.C. §544(b). Section 544(b) allows a Chapter 7 trustee to stand in a creditor's shoes and bring state law claims to avoid transfers on behalf of the debtor's estate, like those based on PUVTA §5104. See United States v. Miller, 604 U.S. 518, 523–24 (2025); In re Carbone, 615 B.R. 76, 79–81 (Bankr. E.D. Pa. 2020); In re David Cutler Indus., Ltd., 502 B.R. 58, 66–67 (Bankr. E.D. Pa. 2013). Count III also advances a theory of constructive fraud. But its statutory predicates are discordant. Thus, although relief will be granted as to Counts I and II, relief must be denied as to Count III.

Counts IV and V are grounded in 11 U.S.C. §548(a)(1)(A) and (B), respectively. These causes of action are substantially like those a trustee can invoke in the guise of a creditor under the PUVTA by way of §544(b). E.g., In re PA Co-Man, Inc., 644 B.R. 553, 605–06 (Bankr. W.D. Pa. 2022) (explaining that the PUVTA "allow[s] a creditor to avoid the same kinds of actually and constructively fraudulent transfers as covered by 11 U.S.C. §§ 548(a)(1)(A) and (B)[,]" respectively). Relief will be granted on both of these counts.

Accordingly, the Trustee is entitled to recover the Transfers under 11 U.S.C. §550, so the relief sought in Count VI will be granted. Relief will be denied as to Counts VII–IX because they were pleaded as alternatives to judgment for the Trustee on any of Counts I–III.

### A. The Transfers Were Constructively Fraudulent

Summary judgment is warranted on Counts II and V if the Trustee can show that: (1) FCC received less than reasonably equivalent value for the Transfers; and (2) FCC was left with

unreasonably small assets as a result.  See In re Fruehauf Trailer Corp., 444 F.3d 203, 210–11 (3d Cir. 2006); 11 U.S.C. §548(a)(1)(B)(ii)(II); 12 Pa. C.S. §5104(a)(2)(i).

### 1. FCC Did Not Receive Reasonably Equivalent Value for the Transfers

Two (2) distinct inquiries govern resolution of the issue as to whether a debtor received reasonably equivalent value in exchange for the transfer of its property interest(s).  The court must determine: (1) whether the debtor received value, and, if so; (2) whether such value was reasonably equivalent to that which the debtor surrendered.  In re R.M.L., Inc., 92 F.3d 139, 149 (3d Cir. 1996).

A transfer passes muster under the first prong if the debtor could have reasonably expected the transaction to directly or indirectly confer "realizable commercial value."  Id. at 152 (emphasis in original) (quoting Mellon Bank, N.A. v. Metro Commc'ns, Inc., 945 F.2d 635, 647 (3d Cir.1991), cert. denied, 503 U.S. 937 (1992)).  Rare is the "occasion[] when a debtor exchanges cash for intangibles that have no 'value' at the time of the transfer."  Id. at 149 n.3.

The Trustee contends that this is one of those rare occasions.  She stresses that the Court need not proceed past the first prong of the R.M.L. test "because it is indisputable that the Debtor received no value for the Transfers."  The Trustee relies on the Phillipps Affidavit, wherein Mr. Phillipps avers that based on his and his staff's review of FCC's available "bank accounts . . . books and records . . . and credit card statements," FCC "received no value from Mr. Shallow in return for the [T]ransfers[.]"  Mr. Phillipps does not explain precisely how he arrived at this determination.  But the assertion seems to flow from the conclusion, formed after detailed review of FCC's bank records, that the Transfers were used to fund Shallow's personal expenditures.

5

It is hard to imagine what purpose the Transfers could have served other than personally enriching the Debtor's president, which is contrary to the interests of FCC's creditors. And "the question whether the debtor received reasonable value must be determined from the standpoint of the creditors." Id. at 150 (emphasis in original) (quoting Metro Commc'ns, 945 F.2d at 646). Thus, the Trustee carries her burden of proof in establishing, by reference to the Phillipps affidavit, that FCC more than likely received no value for the Transfers.

It was incumbent upon Shallow to come forward at this stage with contradictory evidence. See Fed. R. Civ. P. 56(c), (e). Accord Scott v. Harris, 550 U.S. 372, 380 (2007) ("At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."). Shallow has chosen to sit out this round. Consequently, the Court holds that FCC received no value for the Transfers.

Even if FCC received some value for the Transfers, relief is still warranted on Counts II and V if such value was not roughly equivalent to that which FCC gave. In re Fruehauf, 444 F.3d at 212–13. Unlike the first prong of the R.M.L. test, this second prong of analysis calls for a totality of the circumstances assessment, hinging on, for example, whether: (1) the debtor received fair market value; (2) the transaction was conducted at arm's length; and (3) the transferee acted in good faith. Id. at 213. This assessment—like the R.M.L. test as a whole—applies to both PUVTA-driven §544 avoidance claims as well as the standalone §548 variety. See e.g., In re Fid. Bond & Mortg. Co., 340 B.R. 266, 285–87 (Bankr. E.D. Pa. 2006), aff'd sub nom. Fid. Bond & Mortg. Co. v. Brand, 371 B.R. 708 (E.D. Pa. 2007).

6

When the plaintiff contends that the debtor received no value, let alone something shy of fair market value in exchange for a transfer, "the plaintiff must ordinarily prove that the calculated value of the benefit is zero." In re Fruehauf, 444 F.3d at 214. Furthermore, where the only conceivable benefit provided by the defendant is intangible—e.g., employment efforts—and at least theoretically equal to the debtor's outlay, "precise calculations are essential to allow the court to determine equivalency properly." Id. "But this general rule yields to common sense: . . . where a court has sufficient evidence to conclude . . . that the benefits to the debtor are minimal and certainly not equivalent to the value of a substantial outlay of assets, the plaintiff need not prove the precise value of the benefit[.]" Id. And if the plaintiff succeeds in establishing, by a totality of the circumstances, that the debtor received no value, the burden of production shifts to the defendant, who must then provide some contradictory evidence. Id. at 217 (citing In re Rowanoak Corp., 344 F.3d 126, 131–32 (1st Cir. 2003)).

Moreover, "in appropriate circumstances," the court may "employ a rebuttable presumption that the transfer lacked reasonably equivalent value and impose the burden of producing evidence of reasonably equivalent value on the defendant." In re Incare, LLC, 2018 WL 2121799, at *8 (Bankr. E.D. Pa. May 7, 2018) (citing see In re Wettach, 811 F.3d 99, 108–09 (3d Cir. 2016)). It is appropriate to employ such a presumption "as an 'information-forcing' device where one party has superior access to the relevant information or there is a substantial probability that the presumed fact is true." Id. n.17 (quoting In re Wettach, 811 F.3d at 108).

Here, the Trustee was plagued by deficient access to relevant information. After all, the Debtor's president consistently refused to provide the barest of its financial records. It is therefore understandable that the instant Motion rests primarily on the proposition that the Transfers were constructively fraudulent because they personally enriched Shallow when FCC

7

had ceased operations, or when it was insolvent, or both. In other words, the contention is that the Defendant abused his insider status to raid corporate coffers at an especially inopportune time for the Debtor and its creditors. The Trustee made similar arguments at the initial pleading stage. She has since come forward with the Phillipps Affidavit. To reiterate, Mr. Phillipps swears that in his professional opinion, from July 2018 (when FCC was presumed insolvent) onward, FCC received no value whatsoever for the Transfers.

Review of the exhibits confirms that most of the Transfers occurred in 2019 or later, when FCC was book value insolvent, "deep in the red," and had already lost "significant business or ceased business operations" altogether. See In re Fitzpatrick, 670 B.R. at 445–48. Whatever commercial value FCC might have realized after mid-2018 by financing Shallow's personal expenditures is well beyond a reasonable inference. It would be quite a leap to hold, for example, that there is now a genuine question as to whether FCC received roughly what it gave up in paying Shallow's membership dues at a prestigious country club while the Company cratered around him. It would similarly defy logic to hold that there remains a genuine dispute as to whether such a transaction, or any others assailed here—including contemporaneous charges to the Company's credit card made in narrowing intervals on its president's behalf— were conducted in good faith at arm's length.

Accordingly, the Court deems it appropriate to implement a rebuttable presumption that the Defendant failed to provide reasonably equivalent value for the Transfers. Shallow is in no position to rebut such a presumption. Therefore, the only thing standing between the Trustee and summary judgment on Counts II and V is preponderant proof that FCC was in cognizably dire financial straits when the Transfers occurred.

### 2. The Transfers Left FCC with Unreasonably Small Assets

Count II is grounded in PUVTA §5104(a)(2). Subparagraph (ii) contemplates a financial condition, which if proven, satisfies the final element of an accompanying constructive fraud claim by establishing that the debtor: "intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." 12 Pa. C.S. §5104(a)(2)(ii). This condition "is sometimes referred to as 'insolvency in the equity sense[.]'" Uniform Law Comment 5 to 12 Pa. C.S. §5104.

Alternatively, subparagraph (i) provides that a transfer is constructively fraudulent if, in addition to all other elements being met, the transfer left the debtor with unreasonably small assets. 12 Pa. C.S. §5104(a)(2)(i). This "denotes a financial condition short of insolvency." See Brand, 371 B.R. at 722; In re Carbone, 615 B.R. at 85. So, for a defunct business, "the [subparagraph (i)] analysis looks at whether the enterprise's failure was reasonably foreseeable" when the disputed transfer(s) took place. In re Island View Crossing II, L.P., 604 B.R. 181, 200 (Bankr. E.D. Pa. 2019). The reasonable foreseeability test applies also to 11 U.S.C. §548(a)(1)(B), on which Count V is predicated. See 11 U.S.C. §548(a)(1)(B)(ii)(II); Moody v. Sec. Pac. Bus. Credit, Inc., 971 F.2d 1056, 1069–70 (3d Cir.1992).

The Trustee has not made substantive arguments regarding the financial conditions set forth in either of §§5104(a)(2) or 548(a)(1)(B)(ii). However, this Court held in a related Adversary Proceeding that FCC was presumptively insolvent by July 1, 2018, which was two (2) days before the earliest of the Transfer payments cleared. See In re Fitzpatrick, 670 B.R. at 434. And, because the facts on which resolution of this question of law turned—i.e., FCC's general inability to pay its debts as they came due in mid-2018—are identical to those at issue here, the associated holding is law of the case. Arizona v. California, 460 U.S. 605, 618 (1983), decision supplemented, 466 U.S. 144 (1984); Cohen v. Bucci, 905 F.2d 1111, 1112 (7th Cir. 1990)

9

(Easterbrook, J.) ("Adversary proceedings in bankruptcy are not distinct pieces of litigation; they are components of a single bankruptcy case[.]").

With this timeline in view, FCC's failure was reasonably foreseeable once the Transfers began. July 1, 2018, marked more than just FCC's first missed payment on one of its petitioning creditors' invoices; at that point, associated check payments had been delayed for months. In re Fitzpatrick, 670 B.R. at 443. Then, on September 5, 2018, the same creditor began insisting that FCC make payments by wire transfer. Id. Meanwhile, FCC was already experiencing a dramatic downturn in third-party receivables coupled with mushrooming related-party receivables. Id. at 445. FCC's tax returns show that the Company operated in 2018 at an $878,986.00 loss. Id. And each of FCC's petitioning creditors have filed proofs of claim for payments the Company failed to tender them in that year. Id. at 443. These factual findings informed the Court's determination that FCC was presumptively insolvent by mid-2018 and book value insolvent by the end of 2018 when the Company was well on its way to bankruptcy. Id. at 443, 445, 448. Furthermore, it would be illogical to hold that although FCC was insolvent by mid-2018, the Company somehow simultaneously fell short of a condition often described as something shy of insolvency.

For these reasons, the Trustee is entitled to the relief sought in Counts II and V. Count II allows the Trustee to avoid all the Transfers. See 12 Pa. C.S. §5109 (applying a four- (4)-year statute of repose to PUVTA §5104(a)(2), which, as discussed above, is further limited to transfers made by an equitably insolvent debtor or one whose demise was otherwise foreseeable). See also In re Fitzpatrick Container Co., 663 B.R. 648, 658 (Bankr. E.D. Pa. 2024) (fixing at four (4) years before the petition date, the outer look back boundary for PUVTA avoidance claims). Should the need for an alternative avoidance avenue arise, Count V allows the Trustee to avoid

10

those Transfers which occurred on or after October 19, 2018. See 11 U.S.C. §548(a)(1) (providing for the avoidance of transfers made two (2) years before the filing of a petition).

### B. The Transfers Were Made with Actual Intent to Hinder, Delay, or Defraud

With Counts I and IV the Trustee also seeks to avoid the Transfers on a theory of actual fraud. These counts are grounded in 12 Pa. C.S. §5104(a)(1) and 11 U.S.C. §548(a)(1)(A), respectively. Both provisions feature substantially the same elements, so they are uniformly interpretable. E.g., In re PA Co-Man, 644 B.R. at 606. Thus, to succeed on Counts I and IV, the Trustee need only establish that the Transfers were made "with actual intent to hinder, delay or defraud" FCC's creditors. 12 Pa. C.S. §5104(a)(1); 11 U.S.C. §548(a)(1)(A). "The requirement is disjunctive; any one of the three intents is sufficient for liability." 5 Collier on Bankruptcy ¶ 548.04[1][a] (16th 2025).

Of course, defendants rarely volunteer that they intended to hinder, delay, or defraud creditors.[1] So a defendant's actual intent may be inferred from the presence of codified, circumstantial indicia, which are colloquially known as the "badges of fraud." In re Polichuk, 506 B.R. 405, 417 (Bankr. E.D. Pa. 2014). A court can infer the requisite intent where it appears, for example, that:

> (1) the transfer was to an insider; (2) the debtor retained possession of the purportedly transferred property; (3) the transfer was concealed; (4) the debtor was threatened with suit before the transfer; (5) the transfer was of substantially all the debtor's assets; (6) the debtor absconded; (7) the debtor removed or concealed assets; (8) the debtor failed to receive roughly equivalent value for the transfer; (9) the debtor was insolvent or became insolvent shortly after the transfer; (10) the transfer occurred shortly before or shortly after the debtor incurred a substantial

---

[1] Shallow's intent is imputable to FCC. See In re Pers. & Bus. Ins. Agency, 334 F.3d 239, 243 (3d Cir. 2003) ("[I]f an agent is the sole representative of a principal, then that agent's fraudulent conduct is imputable to the principal regardless of whether the agent's conduct was adverse to the principal's interests.") (quoting Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340, 359 (3d Cir. 2001)).

11

debt; and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

See id. at 417–18.  See also 12 Pa. C.S. §5104(b).

Emphasizing the presence of badges one (1) and nine (9), the Trustee stands emphatically on the now familiar, though no less credible, proposition that Shallow took full advantage of his status as FCC's president by personally enriching himself.  And the Trustee notes, as the Court previously held, that the Debtor was insolvent when the Transfers were made.  The Trustee also posits that, given Shallow's position at the Debtor's helm, he would have been fully aware that with each successive transfer, FCC was rendered increasingly insolvent while its creditors' outstanding invoices piled up.

But there are at least four (4) badges at play here.  The Transfers were indeed made by an insolvent debtor to and/or on behalf of an insider (11 U.S.C. §101(31)(B) defines corporate insiders to include a debtor's directors, officers, and control persons).  That said, Shallow also repeatedly stonewalled the Trustee's investigation into FCC's finances.  See In re Fitzpatrick, 663 B.R. at 659–60.  Couple that with the Court's grant of summary judgment as to the Trustee's constructive fraud counts, and badges three (3) and eight (8) are squarely in evidence as well.

Yet even without these latter two (2) badges, the requisite intent has been established, because demonstrating that an insider received transfers without consideration generally suffices to shift the burden of production to the defendant, who must then demonstrate that no fraud was intended.  In re Carbone, 615 B.R. at 84.  See 5 Collier on Bankruptcy ¶ 548.04[1][a] (16th 2025) ("if the debtor arranges and consummates a transaction that depletes assets available to creditors . . . with little or no corresponding benefit to the debtor's estate, then the requirements for actual intent can be met.").  See also id. ¶ 548.04[1][b][ii] ("[O]nce a trustee establishes

12

indicia of fraud in an action under section 548(a)(1), the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue.") (quoting In re Acequia, Inc., 34 F.3d 800, 806 (9th Cir. 1994)).

Shallow's nonparticipation at this stage renders him incapable of meeting that burden. Accordingly, the Trustee is alternatively entitled to the relief sought in Counts I and IV. And at the risk of further repetition, whereas Count I allows the Trustee to avoid all the Transfers, Count IV allows only for avoidance of those that occurred on or after October 19, 2018. See 12 Pa. C.S. §5109; 11 U.S.C. §548(a)(1).

### C. The Transfers Are Not Avoidable Under Count III

With Count III, the Trustee seeks to avoid the Transfers as constructively fraudulent pursuant to PUVTA §5105 by way of 11 U.S.C. §544(a). Because the text of these provisions is irreconcilable, summary judgment will be denied as to Count III.

Section 544(a) of the Code provides that a trustee "shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor . . . that is voidable by[,]" a judicial lien creditor or an unsatisfied execution creditor "that extends credit to the debtor at the time of the commencement of the case . . . whether or not such a creditor exists." 11 U.S.C. §544(a)(1)–(2).[2] "In other words, as of the date of the petition's filing, § 544(a)(1) confers upon the trustee the rights of a hypothetical judgment lien creditor[ and] § 544(a)(2) confers upon the

---

[2] Section 544 goes on to provide trustees with "the rights and powers" of "a bona fide purchaser of real property, other than fixtures, from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists." 11 U.S.C. §544(a)(3). This provision is not relevant to the Trustee's claims, which exclusively concern personal property.

13

trustee the rights of a hypothetical unsatisfied execution creditor[.]" In re Bridge, 18 F.3d 195, 199 (3d Cir. 1994). At bottom then, a hypothetical §544(a) creditor is a legal fiction, one to whose "rights and powers" a trustee succeeds only once a bankruptcy petition is filed. In re Whittaker, Clark, & Daniels, 663 B.R. 1, 19–20 (Bankr. D.N.J. 2024) (citing cases). Critically, the exercise of those "rights and powers" is contingent on their compatibility with applicable state law. Id. at 17–18; In re Bridge, 18 F.3d 195 at 200 ("the scope of [the trustee's §544(a) powers] vis-a-vis third parties is governed entirely by the substantive law of the state in which the property in question is located as of the bankruptcy petition's filing."). Accord 5 Collier on Bankruptcy ¶ 544.02[1] (16th 2025); In re Swarthmore Grp., Inc., 667 B.R. 258, 274 (Bankr. E.D. Pa. 2025).

Counts II, III, and V of the Trustee's complaint are predicated on constructive fraudulent transfer theories. But each count invokes a different admixture of associated federal and/or state avoidance powers, which in turn implicate slightly different elements. This is obscured by the Trustee's brief discussion of these counts under the singular rubric of "Constructive Fraud (Counts . . . II, [III,] and V)." Mot. at 10–13. However, Count I (actual fraud) and Count II both emanate from different provinces of §544 than does Count III. And recall that, for Counts I and II the Trustee relies on §544(b) as her vehicle for coopting the state law avoidance powers available to certain creditors under PUVTA §5104(a).

Nonetheless, because §5104(a) is available to creditors regardless of when their claims arose, the Trustee could also have pursued Shallow under that provision by invoking the rights of a hypothetical judgment lien or unsatisfied execution creditor pursuant to 11 U.S.C. §544(a)(1)–(2). Cf. In re Swarthmore, 667 B.R. at 275–78 (refusing to dismiss §544(a) counts predicated on actual and constructive fraudulent transfer theories grounded in 6. Del. C. §1304, which is, in

14

relevant part, perfectly analogous to PUVTA §5104). See In re Archdiocese of Milwaukee, 483 B.R. 855, 860 (Bankr. E.D. Wis. 2012) ("Although more commonly used to attack unperfected security interests or defective mortgages or deeds, the strong arm power of § 544(a) can be used to prosecute fraudulent transfers, assuming state law would permit that." (citing see Susan V. Kelley, Ginsberg & Martin on Bankruptcy, §9.01[B] (5th ed. Supp. 2012) (emphasis added))).

That said, PUVTA §5105 does not provide the same temporal flexibility as PUVTA §5104. E.g., In re Incare, 2018 WL 2121799, at *8 ("In contrast [to § 5104], § 5105 applies only to creditors whose claims arose before the transfer[.]" (emphasis added)).

Thus, turning squarely now to Count III, the Court finds support only for the axiom that opposites do not always attract. Indeed, Count III is rather like the child of an anathematic statutory marriage, itself born of the Trustee's curious decision to wed §544(a) with PUVTA §5105. These provisions serve, respectively, as the federal and state law avoidance grounds on which Count III is based. Yet the Court was unable to find a single published opinion (apart from those associated with a sister adversary proceeding in this case) where a Trustee invoked §544(a) in tandem with 12 Pa. C.S. §5105 or one of its UVTA analogs. Perhaps that is because these provisions are incompatible.

Section 5105 is reducible to four (4) elements on which the Trustee bears the burden of persuasion. See In re Wettach, 811 F.3d 99, 107 (3d Cir. 2016); 12 Pa. C.S. §5105(b). §5105 requires a claimant to demonstrate: (1) that their claim arose before; (2) a transfer was made, or an obligation was incurred by a debtor; (3) for which the debtor received less than reasonably equivalent value; (4) when the debtor was insolvent or thereby rendered insolvent. See id. §5105(a). The PUVTA defines a "claim" as "a right to payment, whether or not the right is

15

reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." Id. §5101(b).

By its terms, however, none of §544(a)'s hypothetical creditors can "extend[] credit to the debtor" prior to "the commencement of the [bankruptcy] case." 11 U.S.C. §544(a). Neither may a §544(a) creditor obtain in advance of the petition's filing a judicial lien or unsatisfied execution against a debtor. Id. Thus, there is no universe in which a fictional §544(a) creditor can be said to have a pre-petition claim that arose against a §5105 debtor before the latter effected a transfer or incurred an obligation. And a trustee cannot use §544(a) to avoid post-petition transfers. In re Blastein, 244 B.R. 290, 298 (Bankr. E.D. Pa. 2000). It follows that neither a §544(a) creditor, nor the trustee who invokes such a fiction, can meet the first element of a §5105 claim as outlined above. For these reasons, the relief requested in Count III is denied.

### D. The Transfers Are Recoverable

Count VI is predicated on 11 U.S.C. §550. This is little more than "a recovery provision . . . giv[ing] rise to a secondary cause of action . . . after the trustee has prevailed under one (or more) of the avoidance provisions found in the Bankruptcy Code." In re Res., Recycling & Remediation, Inc., 314 B.R. 62, 69 (Bankr. W.D. Pa. 2004). As detailed above, the Trustee has succeeded on Counts I, II, IV and V, which means she has prevailed under 11 U.S.C. §§544 and 548. She is therefore entitled to summary judgment on Count VI. Thus, the Trustee may recover the full value of the Transfers (i.e., $541,685.20) from Shallow, to whom or for whose benefit they were made. See 11 U.S.C. §550(a)(1)–(2).

16

Moreover, because the Trustee has succeeded on all but the third of the first six (6) counts, relief is denied as to Counts VII, VIII, and IX. The only remaining issues are whether the Trustee is entitled to judgment interest, professional fees, and litigation costs.

### E. The Trustee Is Entitled to Judgment Interest, but Not Attorneys' Fees or Costs

Awarding "prejudgment interest is 'within the discretion of the bankruptcy court[.]'" In re David Cutler Indus., Ltd., 502 B.R. 58, 79 (Bankr. E.D. Pa. 2013) (quoting In re Hechinger Inv. Co. of Delaware, Inc., 489 F.3d 568, 579 (3d Cir.2007)). Still, because "prejudgment interest in an avoidance action furthers the congressional policies of the Bankruptcy Code by compensating the estate for the time it was without use of the transferred funds. . . . prejudgment interest should be awarded unless there is a sound reason not to do so." In re Great-Point Intermodal, LLC, 334 B.R. 359, 362–63 (Bankr. E.D. Pa. 2005) (citations omitted). There is no reason not to award the Trustee pre-judgment interest.

This Court also has discretion to determine whether pre-judgment interest should begin to run, for example, from the "date of transfer, date of demand for repayment, [or] date of filing of [the] transfer avoidance complaint[.]" In re David Cutler Indus., Ltd., 502 B.R. at 80. Given Shallow's outsized role in materially delaying this and related phases of litigation, not to mention the Trustee's discovery of the Transfers at issue here, the Court will award pre-judgment interest to the Trustee running from the date that the Transfers began. And the Court joins with others in this District which, in the context of similar federal bankruptcy causes of action, have applied the federal statutory post-judgment interest rate pursuant to 28 U.S.C. §1961 when calculating the pre-judgment rate. See id. at 80–81 (citing Great-Point Intermodal, 334 B.R. at 364).

The Trustee is also entitled to post-judgment interest under the same statute. E.g., Chestnut St. Consol., LLC v. Dawara, 619 F. Supp. 3d 489, 518 (E.D. Pa.), judgment entered, 619 F. Supp. 3d 521 (E.D. Pa. 2022) (explaining that "[t]he award of post-judgment interest is governed by the federal post-judgment interest statute, 28 U.S.C. § 1961.").

Finally, the Trustee's request for the shifting of attorneys' fees and costs is premature. If the Trustee wishes to shift attorneys' fees, she must, within fourteen (14) days after judgment is entered, file a motion specifying the grounds entitling her to such an award. See Fed. R. Civ. P. 54(d)(2); Fed. R. Bankr. P. 7054(b)(2)(A). Similarly, cost shifting requests are more properly directed in the first instance to the clerk, who, "on 14 days' notice, may tax costs[.]" Fed. R. Bankr. P. 7054(b)(1). Review of the clerk's action then falls to the Court "on motion served within the next 7 days." Id. Only then does the Court weigh various related equitable factors, including: "(1) the unclean hands, or bad faith or dilatory tactics, of the prevailing party; (2) the good faith of the losing party and the closeness and difficulty of the issues they raised[.]" See In re Paoli R.R. Yard PCB Litig., 221 F.3d 449, 463 (3d Cir. 2000), as amended (Sept. 15, 2000).

## V. CONCLUSION

For the foregoing reasons, the relief requested in Counts I, II, IV, V, and VI will be granted. But the relief requested in Counts III, VII, VIII, and IX will be denied. Furthermore, although the Trustee is entitled to pre- and post-judgment interest—accruing from July 1, 2018, onward—she is not yet entitled to shift her attorneys' fees and costs. An appropriate order will follow.

Date:  December 11, 2025

_____
Patricia M. Mayer
United States Bankruptcy Judge

18